IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JEFFERY SCOTT ROGERS, | Case No. 6:19-cv-00438-SB |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| REED PAULSON; WILLIAM STRAUSS; and CHRISTOPHER DIGIULIO, | |
| Defendants. | |

**BECKERMAN, U.S. Magistrate Judge.**

Plaintiff Jeffery Scott Rogers ("Rogers"), an individual in the custody of the Oregon Department of Corrections ("ODOC"), filed this action under 42 U.S.C. § 1983 against Christopher DiGiulio ("Dr. DiGiulio"), Medical Director at the Oregon State Penitentiary ("OSP"), and two OSP medical providers, Reed Paulson ("Dr. Paulson") and William Strauss ("Dr. Strauss") (together with Dr. DiGiulio, "Defendants"). (ECF No. 1.) Rogers alleges deliberate indifference to his serious medical needs and denial of adequate pain management in violation of his Eighth Amendment rights. All parties have consented to the jurisdiction of a U.S. Magistrate Judge pursuant to 28 U.S.C. § 636.

PAGE 1 – OPINION AND ORDER

The parties now cross-move for summary judgment. (ECF No. 22; ECF No. 48.) For the reasons explained below, the Court grants Defendants' motion for summary judgment and denies Rogers' motion for summary judgment.

## BACKGROUND

### I.    ROGERS' MEDICAL ISSUES

Rogers is an individual in ODOC's custody and is currently incarcerated at OSP. On December 2, 2017, Rogers underwent abdominal surgery for a bowel obstruction. (Pl.'s Aff. in Support of Mot. Summ. J. ("Rogers Aff.") ¶ 7, ECF No. 23; Decl. of William Strauss ("Strauss Decl.") ¶ 8, ECF No. 49; *id.* Ex. 1, at 9.) Medical providers from Salem Health performed the surgery at the Salem Hospital. (Strauss Decl. ¶ 8; Rogers Aff. ¶ 7.) Rogers' incision was closed with staples. (Rogers Aff. ¶ 7; Strauss Decl. Ex. 1, at 6.) Rogers understood from doctors' instructions at Salem Hospital that the staples should be removed "in around 3 weeks," at a follow-up appointment scheduled for December 24, 2017.[1] (Rogers Aff. ¶¶ 7, 10.) Rogers' discharge instructions from the hospital, however, indicated that the staples should be removed within ten to fourteen days after the surgery. (Strauss Decl. Ex. 1, at 6.) Upon Rogers' return to OSP on December 10, 2017, the infirmary admission notes indicated that his incision was leaking serosanguinous fluid into his dressing. (*Id.* at 20.) Several days later, medical progress notes indicated that the incision continued to leak serosanguinous fluid, but that the provider did not believe the wound was infected. (*Id.* at 19.)

---

[1] Rogers cites to Exhibit 1 of Plaintiff's Motion for Summary Judgment in support of his allegation that he was told at some point before his discharge that he would be scheduled to have the staples removed "in around 3 weeks" at Salem Health. (Rogers Aff. ¶ 7.) Exhibit 1 supports that Rogers was scheduled for an appointment to "follow up with Salem Health Surgery" on December 24, 2017, but it does not indicate whether the staples were to be removed at this appointment. (Pl.'s Mot. Ex. 1.)

PAGE 2 – OPINION AND ORDER

On December 15, 2017, Dr. Strauss examined Rogers' incision. (Rogers Aff. ¶ 9; Strauss Decl. ¶¶ 12-13.) Dr. Strauss observed that the incision appeared to be healing and the staples were ready to be removed. (Rogers Aff. ¶ 9; Strauss Decl. ¶¶ 12-13.) Rogers objected to the removal of the staples and told Dr. Strauss that the doctors at Salem Hospital had informed him that the staples should be removed at his follow-up appointment on December 24. (Rogers Aff. ¶¶ 9-10.) Strauss removed Rogers' staples that day, and OSP medical staff canceled Rogers' December 24 follow-up appointment at Salem Hospital. (Rogers Aff. ¶¶ 9-10; Strauss Decl. ¶ 13.) After removal, Dr. Strauss prescribed Rogers a narcotic medication to alleviate his pain. (Strauss Decl. ¶ 13; *id.* Ex. 1, at 12.)

On December 17, 2017, Rogers awoke in his cell to severe pain, and discovered that his wound dressing had fallen off. (Rogers Aff. ¶ 11.) His bed sheets were covered in blood and other bodily fluids, and he had an open wound at his incision. (*Id.* ¶ 12.) Rogers visited the infirmary where medical staff cleaned and bandaged his wound. (*Id.* ¶ 14.) On January 3, and January 5, 2018, Rogers was examined by two different doctors who opined that Rogers' incision was healing well. (Strauss Decl. ¶¶ 18-19; *id.* Ex. 1 at 15, 21.)

On February 14, 2018, during a medical appointment, medical staff discovered a golf ball-sized ventral incisional hernia in Rogers' abdomen.[2] (Rogers Aff. ¶ 16; Pl.'s Mot. Ex. 6; Strauss Decl. ¶ 20; *Id.* Ex. 1, at 14.) According to Rogers, the medical provider insisted that the hernia "was no big deal and should not cause me any problems," and that "there was minimal

---

[2] Rogers states that it was Dr. Paulson who diagnosed his hernia at the February 14, 2018, appointment. (Rogers Aff. ¶ 16.) However, Dr. Paulson states that he "did not make the medical note from February 14, 2018," relating to the appointment diagnosing the hernia, and that the handwriting for the note is not his own. (Decl. of Reed Paulson ("Paulson Decl.") ¶ 14.) The medical notes from February 14, 2018, either do not include a name for the medical provider or the name is not legible. (Pl.'s Mot. Ex. 6.)

chance of any complications."³ (Rogers Aff. ¶ 16.) Rogers' hernia continued to grow and became increasingly painful. (*Id.* ¶ 20; Pl.'s Mot. Ex. 8.) Rogers was prescribed Cymbalta to treat his pain. (Rogers Aff. ¶ 20; Pl.'s Mot. Ex. 8.) On March 27, 2018, Rogers sent a kyte to OSP Medical requesting hernia repair surgery and claiming that his hernia resulted from Dr. Strauss removing his staples too early. (Pl.'s Mot. Exs. 9-10; Rogers Aff. ¶ 19.)

In April 2018, the Therapeutic Level of Care ("TLC") committee approved Rogers "for surgical repair of baseball size ventral hernia."⁴ (Strauss Decl. ¶ 20; *id.* Ex. 1, at 28; Rogers Aff. ¶ 21; Pl.'s Mot. Ex. 11; Decl. of Adam Kidwell ("Kidwell Decl.") Ex. 3, at 5.) On May 9, 2018, Rogers sent a kyte to OSP Medical about the timing of his Cymbalta doses, in which he explained that the Cymbalta "works moderately well although some days the pain is at times overbearing. I'm open to options."⁵ (Pl.'s Mot. Ex. 12.)

On May 18, 2018, Dr. Strauss consulted with Rogers about his approved hernia surgery and referred Rogers to OHSU for surgical hernia repair. (Pl.'s Mot. Ex. 13; Rogers Aff. ¶ 24; Strauss Decl. ¶ 22.) It is not clear what happened next in the process of scheduling Rogers' surgery. Later, an October 23, 2018, letter from Dr. DiGiulio noted that, "[i]t is unclear why the surgery at OHSU was not processed as it should have." (Pl.'s Mot. Ex. 11; Kidwell Decl. Ex. 3,

---

³ Rogers alleges that Dr. Paulson made these comments. (Rogers Aff. ¶ 16.) Dr. Paulson denies making them. (Paulson Decl. ¶ 14.)

⁴ Rogers alleges that the surgery was approved on April 6, 2018, citing Dr. DiGiulio's letter responding to Rogers' first grievance appeal. (Rogers Aff. ¶ 21; Pl.'s Mot. Ex. 11; Kidwell Decl. Ex. 3, at 5.) Dr. Strauss states that the TLC committee approved the surgery on April 19, 2018, and provides a form reflecting that the request was submitted to the TLC committee on April 6 and reviewed by the committee on April 19, 2018. (Strauss Decl. ¶ 20; *id.* Ex. 1, at 28.)

⁵ In this kyte, Rogers referred to Duloxetine rather than Cymbalta. (Pl.'s Mot. Ex. 12.) Duloxetine is another name for Cymbalta. (Paulson Decl. ¶ 10.) For clarity, the Court will continue to use the term Cymbalta.

PAGE 4 – OPINION AND ORDER

at 5.) An April 15, 2019, letter from ODOC Health Services Administrator Joe Bugher acknowledged a "gap in time between Dr. Strauss's referral and the processing of that order approximately four months later" that was "due in part to our process of paper charting." (Pl.'s Mot. Ex. 40.)

Between May and July 2018, Rogers sent five kytes to OSP Medical inquiring as to the status of his surgery and requesting pain management. (Pl.'s Mot. Exs. 12-17; Rogers Aff. ¶¶ 23, 25-28.) He was told in response that the hernia surgery was "in the scheduling process." (Pl.'s Mot. Ex. 14.)

## II.    ODOC'S GRIEVANCE PROCESS

ODOC employs a three-step grievance and appeal process. Or. Admin. R. 291-109-0100 ("OAR") et seq.[6] Generally, an adult in custody ("AIC") must file a grievance with the grievance coordinator within thirty days of the alleged condition or incident. (Kidwell Decl. ¶ 11; OAR 291-109-0150(2).) If an AIC is dissatisfied with the initial response to an accepted grievance, the AIC may appeal the denial in a two-level system of review. (Kidwell Decl. ¶ 13; OAR 291-109-0170.) If the first appeal is denied, the AIC may file a second appeal with the Grievance Coordinator within fourteen days of the date the denial was sent to the AIC. (Kidwell Decl. ¶ 15; OAR 291-109-0170(2)(c).) The Grievance Coordinator forwards the appeal to an assistant director, or the assistant director's designee, who then has thirty days to issue a second (and

---

[6] Chapter 291, Division 109 of Oregon's administrative rules was amended effective October 18, 2019. See OFFICE OF THE SEC'Y OF STATE, *Permanent Administrative Order DOC 16-2019* (Oct. 17, 2019), available at https://secure.sos.state.or.us/oard/viewReceiptPDF.action?filingRsn=42510 (last visited Mar. 5, 2021) ("Permanent Administrative Order"). The amendment repealed OARs 291-109-0120 through 291-109-190 and replaced them with OARs 291-109-0205 through 291-109-0250, which employ the same three-step grievance appeal structure. *Id.* The rules applicable to Rogers' 2018 grievance process are the former rules. (*See* Kidwell Decl. ¶ 7.)

PAGE 5 – OPINION AND ORDER

final) response. (Kidwell Decl. ¶ 16.) A decision on a second appeal is final and not subject to further review. (*Id.*; OAR 291-109-0170(2)(f).)

Under the rules applicable at the time of Rogers' grievance, an AIC could not file a grievance regarding "[c]laims or issues for which the inmate has filed a Notice of Tort[.]"[7] (Kidwell Decl. ¶ 7; *id.* Ex. 1, at 3; OAR 291-109-01430(g).) If an AIC filed a tort claim notice during the grievance process, the process was terminated pursuant to the relevant administrative rules.[8] (Kidwell Decl. ¶ 17; *see* OAR 291-109-0160(4) ("If at any time the grievance coordinator determines the inmate has pursued his/her issue through state or federal courts, or has filed a notice of tort claim, the grievance process will cease and the grievance will be returned to the inmate.").)

## III.   ROGERS' GRIEVANCE HISTORY

On August 16, 2018, Rogers filed a grievance pursuant to ODOC's grievance procedures. (Pl.'s Mot. Ex. 18; Kidwell Decl. ¶ 19; *id.* Ex. 3, at 1-2.) The subject of the grievance was (1) Rogers' development of a hernia allegedly due to early removal of his staples by Dr. Strauss, (2) allegedly inadequate management of pain and distress from the hernia, and (3) the delay in scheduling Rogers' hernia repair surgery. (Rogers Aff. ¶ 29; Kidwell Decl. ¶ 19.) On August 28, 2018, OSP responded to Rogers' grievance, stating that Rogers' surgery was in the process of

---

[7] In October 2019, OAR 291-109-0140 was repealed and replaced with OAR 291-109-0210, which disallows grievances only for "claims or issues the AIC has pursued in pending litigation in state or federal courts," and no longer prohibits grievances based on an AIC's filing of a tort claim notice. OAR 291-109-0210(3)(h).

[8] OAR 291-109-0160 was also repealed in 2019. Permanent Administrative Order at 9. The new rule states, "[i]f an AIC has filed a Notice of Tort Claim with the Oregon Department of Administrative Services while an AIC has an active complaint, and the primary remedy sought by the grievance is monetary relief, DOC may, in its sole discretion, discontinue further processing of the grievance and notify the AIC of the conclusion of the administrative review process." OAR 291-109-0225(6).

PAGE 6 – OPINION AND ORDER

being scheduled, and that OSP medical staff has no control over scheduling. (Pl.'s Mot. Ex. 19; Rogers Aff. ¶ 30; Kidwell Decl. ¶ 20.) On September 12, 2018, Rogers appealed OSP's response. (Pl.'s Mot. Ex. 20; Rogers Aff. ¶ 31; Kidwell Decl. ¶ 21.)

On October 23, 2018, Rogers received a response to his grievance appeal from Dr. DiGiulio stating that OSP did not process his surgery request correctly, and that OSP medical staff were looking into expediting the surgery scheduling process. (Pl.'s Mot. Ex. 11; Rogers Aff. ¶ 37; Kidwell Decl. ¶ 22.) On October 30, 2018, Rogers filed his second and final appeal of DiGiulio's response. (Pl.'s Mot. Ex. 27; Rogers Aff. ¶ 39; Kidwell Decl. ¶ 23.) Mr. Kidwell, the grievance coordinator, forwarded Rogers' second appeal to the assistant director of ODOC on November 7, 2018. (Kidwell Decl. ¶ 23.) Under the applicable grievance rule, the assistant director's response to Rogers' second and final grievance appeal was due December 7, 2018.[9] (*Id.*; *see* OAR 291-109-0170(2)(e).)

On or about December 1, 2018, Rogers filed a Notice of Tort Claim.[10] (Rogers Aff. ¶ 41; Pl.'s Mot. Ex. 29.) On December 5, 2018, Rogers' final grievance appeal was returned to him, with a letter explaining that the grievance process was terminated due to Rogers' filing of the tort claim notice, and citing the following grievance rule: "If at any time the grievance coordinator

---

[9] In a letter responding to the rejection of his second grievance appeal, Rogers stated that the response to his second grievance appeal was due on November 28, 2018. (Pl.'s Mot. Ex. 32, at 2.) Rogers cited OAR 291-109-0160 as providing twenty-one days from November 7, 2018, the date of the assistant director's receipt of the second grievance appeal, for a response. *Id.* However, OAR 291-109-0160 provided the timeline for the initial grievance process, not the grievance appeal process. The rule governing the second grievance appeal provided thirty days from the assistant director's receipt of the appeal for a response, resulting in a December 7, 2018 due date. *See* OAR 291-109-0170(2)(e).

[10] Rogers states that he filed the notice "[o]n or about 12-01-18." (Rogers Aff. ¶ 41.) The notice itself is not dated. (Pl.'s Mot. Ex. 29.) A letter from Risk Management acknowledging receipt of Rogers' notice and assigning him a claim number refers to Rogers' letter as submitted "in November 2018." (Pl.'s Mot. Ex. 30.)

PAGE 7 – OPINION AND ORDER

determines the inmate has pursued his/her issue through state or federal courts, or has filed a notice of tort claim, the grievance process will cease and the grievance will be returned to the inmate." (Kidwell Decl. ¶ 25, citing OAR 291-109-0160(4) and 291-109-0140(3)(g); *see also* Pl.'s Mot. Ex. 31; Rogers Aff. ¶ 43.) On December 19, 2018, Rogers received a letter denying his tort claim. (Pl.'s Mot. Ex. 34.)

## IV.    ROGERS' HERNIA SURGERY

In late December 2018, Rogers was transported to OHSU for a surgical consultation. (Pl.'s Mot. Ex. 36.) On January 16, 2019, in response to a kyte asking again about surgery and pain relief, staff informed Rogers for the first time that his surgery was scheduled, although staff could not disclose the date for security reasons. (Pl.'s Mot. Ex. 35.) Rogers continued to file medical kytes complaining of the delay in hernia surgery and a lack of proper pain management. (Rogers Aff. ¶¶ 47-51; Pl.'s Mot. Exs. 35-39.) Rogers underwent hernia repair surgery on May 6, 2019. (Rogers Aff. ¶ 55.)

## DISCUSSION

Defendants move for summary judgment on, *inter alia*, the ground that Rogers failed to exhaust his available administrative remedies. (Defs.' Mot. at 8-9.) The Court agrees.

## I.    STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of

PAGE 8 – OPINION AND ORDER

fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## II.     APPLICABLE LAW

"The PLRA requires prisoners to exhaust available administrative remedies prior to filing a . . . lawsuit challenging prison conditions." *Draper v. Rosario*, 836 F.3d 1072, 1078 (9th Cir. 2016) (citations omitted). In *Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014) (en banc), the Ninth Circuit held that the defendant bears the burden of proving that an administrative remedy was available to the prisoner and that he failed to exhaust such remedy, because non-exhaustion is an affirmative defense. *Id.* at 1172. "Once the defendant has carried that burden, the prisoner has the burden of production. That is, the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* The proper procedure for raising non-exhaustion, as clarified in *Albino*, is by moving for summary judgment. *Id.* at 1169-71.

## III.    ANALYSIS

### A.      Failure to Exhaust

Defendants have met their initial burden of showing that an administrative remedy was available to Rogers, and that he failed to exhaust the remedy.

When available, ODOC's three-level appeal process satisfies the administrative remedies exhaustion requirement under 42 U.S.C. § 1997(e)(a). *See Iniguez v. Templin*, No. 2:17-cv-01513-SB, 2019 WL 438547, at *2 (D. Or. Jan. 11, 2019). Pursuant to this policy, Rogers filed all three levels of grievances, each of which OSP initially accepted for review. (*See* Kidwell Decl. ¶¶ 19-23; *id.* Ex. 3; Rogers Aff. ¶¶ 29, 31, 39; Pl.'s Mot. Exs. 11, 18-20, 27.)

PAGE 9 – OPINION AND ORDER

However, under the administrative rules applicable at the time, "[i]f at any time the grievance coordinator determines the inmate has pursued his/her issue through state or federal courts, or has filed a notice of tort claim, the grievance process will cease and the grievance will be returned to the inmate." (Kidwell Decl. ¶ 25, citing OAR 291-109-0160(4) and 291-109-0140(3)(g); *see also* Pl.'s Mot. Ex. 31; Rogers Aff. ¶ 43.) Rogers filed a tort claim notice while his second and final grievance appeal was still pending. (Pl.'s Mot. Ex. 29; Kidwell Decl. ¶ 23.) After realizing that Rogers had filed a tort claim notice, Mr. Kidwell returned Rogers' second grievance appeal to him without a response pursuant to OAR 291-109-0160(4), stating that Rogers' failure to comply with the administrative rule ended the grievance process. (Pl.'s Mot. Ex. 31; Kidwell Decl. ¶ 25.)

**B.    Availability of Grievance Process**

Having found that Rogers failed to exhaust ODOC's grievance process, the Court turns to whether there was "something in [Rogers'] particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172.

"[W]here a plaintiff fails to comply with deadlines or procedural rules governing grievances, so that his own failure causes remedies to become 'unavailable,' the mistake is laid at his feet, and it is said that exhaustion was not 'proper.'" *Vega v. Bell*, No. 2:13-cv-00931-HU, 2015 WL 413796, at *3 (D. Or. Jan. 29, 2015) (citing *Woodford v. Ngo*, 548 U.S. 81, 89-91 (2006)). Thus, the return of Rogers' second grievance appeal without a response does not, standing alone, demonstrate that the grievance process was not "available" to Rogers. *See Todd v. Or. Dep't of Corr.*, No. 2:16-cv-00878-YY, 2017 WL 2888577, at *2 (D. Or. June 16, 2017) (finding that the plaintiff failed to exhaust administrative remedies when the grievance process ended prematurely due to plaintiff's filling of a tort claim notice); *see also Clardy v. Jones*, 2:15-

cv-01241-CL, 2020 WL 6937453, at *2 (D. Or. June 16, 2020) (same); *Dunn v. Myrick*, No. 2:16-cv-02345-TC, 2018 WL 1833875, at *4-5 (D. Or. Feb. 20, 2018) (same).

However, the Court acknowledges that while Rogers was required to refrain from filing a tort claim notice until the grievance process was complete in order to exhaust his administrative remedies, he was also required to provide the state with notice of his claim "within 180 days after the alleged loss or injury" in order to preserve any state law tort claims against an Oregon public body or its employees. OR. REV. STAT. § 30.275(2)(b).[11] That choice has the potential to create a Catch-22 for AICs seeking to exhaust administrative remedies while also preserving a tort claim.

In *Clardy v. Gilmore*, 773 F. App'x 958, 960 (9th Cir. 2019), *cert. denied* 140 S. Ct. 946 (2020), the Ninth Circuit recognized that this tension between the prohibition on filing tort claim notices during the grievance process and the statutory tort claim notice requirement could render the administrative process unavailable by requiring a plaintiff "to choose between fully exhausting or timely filing a notice of tort claim."[12] *See also Vega*, 2015 WL 413796 at *6

---

[11] Under the applicable rules, the timeline provided for the grievance process runs for 163 days. (*See* OAR 291-109-0150(2) (30 days to file grievance); OAR 291-109-0160(2)(a) (45 days to respond, "unless further investigation is necessary"); OAR 291-109-0170(1)(b) (14 days to file appeal); OAR 291-109-0170(1)(d) (30 days to respond); OAR 291-109-0170(2)(c) (14 days to file final appeal); OAR 291-109-0170(2)(e) (30 days to respond).) In addition to the 163 days anticipated in the regulations, each time that a grievance or appeal is filed, the deadline for a response does not begin to run until the Grievance Coordinator forwards the grievance to the appropriate official, a task that is not subject to any deadline. (*See, e.g.*, OAR 291-109-0170(2)(e).) In this case, for example, the Grievance Coordinator did not forward Rogers' second grievance appeal to the appropriate official until eight days later, delaying the deadline for a final response on Rogers' grievance from November 29, 2018, to December 7, 2018. (Kidwell Decl. ¶ 23.)

[12] The Ninth Circuit also reversed a finding of failure to exhaust due to prematurely filing a tort claim notice in *White v. Hall*, 384 F. App'x 560, 561 (9th Cir. 2010). However, as explained in *Vega,* 2015 WL 413796, at *5, *White* "dealt with the institution's misapplication of" an earlier rule that "said *nothing* about tort claim notices causing the grievance procedure to

PAGE 11 – OPINION AND ORDER

(noting that "had the prison officials delayed to the point where the [tort claim notice deadline] was imminent," the plaintiff's filing of a tort claim notice while a grievance appeal was pending "would likely be excused").

Similarly, in *Baker v. Oregon Department of Corrections*, No. 2:18-cv-00272-TC, 2018 WL 2225353, at *4 (D. Or. Feb. 20, 2018), the court held that the administrative grievance process was "effectively unavailable" because the plaintiff filed a tort claim notice "only ten days or so" before the tort claim notice deadline and the prison's response to the plaintiff's pending second and final grievance was not due until after the tort claim notice deadline would have expired. In *Baker*, the Court reasoned that, while "cessation of an administrative review process due to a tort claim notice generally does not render administrative remedies unavailable," a review of prior cases finding failure to exhaust due to filing an early tort claim notice revealed that in each case "the plaintiff had filed a tort claim notice months, not days, before the 180-day deadline." *Id.* (citing *Vega*, 2015 WL 413796, at *6 ("Here, Mr. Vega filed his notice less than 60 days after the incident, 120 days before his tort claim notice was due."), *Lovelady v. Beamer*, No. 2:14-cv-00769-KI, 2014 WL 7228870, at *3 (D. Or. Dec. 17, 2014) (noting that the plaintiff filed a tort claim notice only two days after his initial grievance and "did not even wait to receive a response to his grievance before he submitted his tort claim notice"), and *Randall v. DiGiulio*, No. 3:12-CV-02277-HU, 2013 WL 6498759, at *3 (D. Or. Dec. 9, 2013) (emphasizing that the plaintiff initiated the grievance process and filed his tort claim notice "just three days later")).[13]

---

cease," as opposed to the later rule specifically prohibiting filing a tort claim notice. (Emphasis in original.)

[13] Facing a similar timeline, the plaintiff in *Alexander v. Peters*, No. 2:15-cv-02179-CL, 2019 WL 2529568, at *2 (D. Or. Apr. 12, 2019) was also excused from failing to exhaust due to filing a tort claim notice when he was told that "if you are attempting to file a tort you can move ahead with that process at any time," the grievance process was delayed past the stated deadline

PAGE 12 – OPINION AND ORDER

Thus, the grievance process is unavailable only where the deadline for filing a tort claim notice is approaching, and the AIC must choose between exhausting his administrative remedies or filing a tort claim notice.

### C. Tort Claim Notice Deadlines

The Court finds that the administrative grievance process was available to Rogers, but he prematurely aborted the process by filing his tort claim notice at a time when he was not facing the expiration of his tort claim notice deadline.

To preserve his tort claims, Rogers was required to provide the state with notice "within 180 days after the alleged loss or injury." OR. REV. STAT. § 30.275(2)(b). Here, Rogers asserts claims based on (i) Dr. Strauss' removal of Rogers' staples, (ii) the delay in scheduling his hernia repair surgery, and (iii) inadequate pain management while awaiting surgery. As discussed below, no tort claim notice deadline was imminently approaching such that Rogers was forced to choose between completing the grievance process and filing a timely tort claim notice with respect to any of his claims. *See Clardy,* 773 F. App'x at 960 (noting that the exhaustion and tort claim notice requirements might force a prisoner to "choose between fully exhausting or timely filing a notice of tort claim").

#### 1. Removal of Staples

Rogers' first claim stems from Dr. Strauss' removal of staples from the incision site of his December 2017 abdominal surgery. (Pl.'s Mot. at 2.) Under Oregon's discovery rule, the Oregon Tort Claims Act ("OTCA") clock is triggered when "a plaintiff knows, or should have known, of a substantial probability that three elements exist: (1) harm; (2) causation; and (3)

---

for a response on the plaintiff's second grievance appeal, and he filed a tort claim notice approximately two days before the notice was due.

PAGE 13 – OPINION AND ORDER

tortious conduct." *Dickson v. TriMet*, 289 Or. App. 774, 799 (2018). "A plaintiff does not need to identify a particular theory of recovery," before the OTCA clock is triggered. *Curzi v. Or. State Lottery*, 286 Or. App. 254, 267 (2017) (quoting *Gaston v. Parsons*, 318 Or. 247, 255 n.8 (1994)). "'[I]f a plaintiff knows that he or she has suffered some harm and knows that it is the result of tortious conduct, an argument that the plaintiff did not know the full extent of the harm or that those facts had legal significance will be of no avail.'" *Dickson*, 289 Or. App. at 799 (quoting *Doe v. Lake Oswego School Dist.*, 353 Or. 321, 335 (2013)).

Here, Rogers was aware of his claims based on the removal of staples by no later than March 27, 2018, when he alleged in his request for surgery that his hernia was the result of Dr. Strauss' early removal of staples. (*See* Pl.'s Mot. Ex. 9.) Therefore, when Rogers filed his tort claim notice on or about December 1, 2018, he was not in the position of choosing between exhausting remedies and filing a tort claim notice regarding his staple removal claim because the tort claim notice deadline for this claim had already expired at least two months earlier.

### 2. Delay in Hernia Repair Surgery

Rogers also asserts a claim based on the delay in scheduling his hernia repair surgery. (Pl.'s Mot. at 6-9.) Under Oregon law, when "either no single act gives rise to the tort claim or the plaintiff's harm can be determined only at the end of a series of alleged wrongful acts based on the *cumulative* effect of the wrongful behavior," the claim is a continuing tort and "timely OTCA notice need only be made at 'any time during the continuance of the conduct or within 180 days after its conclusion.'" *Curzi*, 286 Or. App. at 265-66 (quoting *Holdner v. Columbia Cnty.*, 51 Or. App. 605, 613 (1981)) (emphasis in original). A continuing tort is distinguished from "repetitious and discrete torts which result in similar but separate injuries." *Curzi*, 286 Or. App. at 266. A claim is not a continuing tort merely because it is based on a failure to perform a legal duty that is ongoing, and the claim will still accrue from any date of refusal to perform the

PAGE 14 – OPINION AND ORDER

duty or other discrete event that would reasonably have alerted the plaintiff to the three elements of harm, causation, and tortious conduct. *See, e.g.*, *Baker*, 2018 WL 2225353, at *4 (holding that ongoing failure to provide religious accommodations was not a continuing tort and instead accrued when plaintiff received defendant's letter denying requested accommodations).[14]

Rogers' claim based on the delay in his surgery is a continuing tort because no discrete action or explicit refusal to provide the requested care put Rogers on notice that his surgery could have been delayed to a level that breached a duty of care. Rather, the cumulative experience over the course of months waiting for his requested surgery led him to file a grievance demanding a surgery that he was assured was already approved and being scheduled. (*See* Pl.'s Mot. Exs. 11, 14, 16, 19, 24 (assuring Rogers throughout June 2018 to October 2018 that his surgery was approved and being scheduled).) As a continuing tort, Rogers' claim based on the delay in his hernia repair surgery had not yet accrued as of December 1, 2018, because he had not yet received the hernia surgery, and thus no tort claim notice was due when Rogers filed his tort claim notice. *See Bond v. Oregon*, No. 3:16-cv-00648-YY, 2017 WL 3184186, at *5 (D. Or. July 6, 2017) (treating inadequate medical care claim as accruing on date incarcerated plaintiff eventually received treatment for condition diagnosed eleven months earlier).

### 3. Inadequate Pain Management

Rogers' final claim is for inadequate pain management. To the extent that Rogers' inadequate pain management claim is based on a cumulative course of conduct rather than

---

[14] *See also Columbia Cnty. v. Sande*, 175 Or. App. 400, 405 (2001) (explaining that "when there is an ongoing duty of care on the part of a defendant the continued failure to exercise that duty may be characterized as a 'continuing tort,'" but holding that the county's negligent denial of a certificate of occupancy was not a continuing tort because it was "based on a discrete event"); *Reuther v. Fickle*, No. 2:11-CV-01449-PK, 2014 WL 3858392, at *23 (D. Or. Aug. 5, 2014) (analyzing specific incidents of failure to treat chronic back pain separately).

specific instances of inadequate pain management, this claim is also a continuing tort for which no tort claim notice deadline was approaching when Rogers filed the notice. *See Urbick v. Suburban Med. Clinic, Inc.*, 141 Or. App. 452, 457 n.3 (1996) (noting that a claim based on continuous negligent medical treatment accrued "from the last date of treatment" under the continuing tort theory).

Alternatively, inadequate pain management may also qualify as "repetitious and discrete torts which result in similar but separate injuries" when discrete incidents of inadequate pain management would have alerted a plaintiff to the reasonable possibility of the existence of the three elements of harm, causation, and tortious conduct. *Curzi*, 286 Or. App. at 266; *see also Reuther*, 2014 WL 3858392, at *20-24 (separately analyzing individual incidents of alleged deliberate indifference in medical care for incarcerated patient's back pain); *Lavender v. Lampert*, 242 F. Supp. 2d 821, 847 (D. Or. 2002) (finding that "[w]hile the record overall demonstrates a failure to develop and implement a comprehensive plan to treat plaintiff's chronic pain, several incidents are particularly egregious," and analyzing these specific incidents for deliberate indifference). Whether these elements were satisfied is a question of fact unless a reasonable trier of fact could only reach one conclusion. *See Barrington ex rel. Barrington v. Sandberg*, 164 Or. App. 292, 297-98 (1999) (finding summary judgment inappropriate where a jury could have found that only the defendants' cumulative course of conduct, but not individual abusive actions, caused the plaintiff emotional distress, in which case the claim would survive the statute of limitations as a continuing tort). Thus, if a reasonable trier of fact could conclude that a cause of action accrued from a discrete incident of inadequate pain management roughly 180 days prior to when Rogers submitted his notice of tort claim, Rogers would have been forced

PAGE 16 – OPINION AND ORDER

to choose between exhausting the grievance process and preserving his state tort claims, and the Court could excuse his failure to exhaust.

Rogers does not point to any incident of potentially inadequate pain management that would have accrued in or about June 4, 2018, that would have placed him in the position of choosing between timely filing a tort claim notice and exhausting his grievance appeal. The record reflects that Rogers alleges that he was inappropriately denied narcotic pain medications and prescribed only Cymbalta and nortriptyline for pain associated with his hernia and with Crohn's disease throughout the more than 500 days he waited for his surgery. (Pl.'s Mot. at 8-9.) Rogers was first prescribed Cymbalta on March 28, 2018. (Rogers Aff. ¶ 20; Pl.'s Mot. Ex. 10.) On May 9, 2018, Rogers sent a kyte to medical stating that the Cymbalta "work[ed] moderately well although some days the pain is at times overbearing. I'm open to options." (Pl.'s Mot. Ex. 12.) In response to his complaint, Rogers was scheduled to see a medical provider, and Rogers does not allege or offer evidence that anything about this appointment was inadequate. (*Id.*) On June 5, 2018, 180 days before he would later file his tort claim notice, Rogers asked about whether his surgery had been scheduled, but did not bring up pain management. (Pl.'s Mot. Ex. 14.) Rogers did not complain about pain management again until June 25, 2018, when he wrote in a kyte to medical about increased pain and explained that "Cymbalta help[ed] for [the hernia and Crohn's disease] but is becoming less effective." (Rogers Aff. ¶ 26; Pl.'s Mot. Ex. 15.) In response, Rogers was again scheduled for a medical appointment, but he does not allege any inadequacies with respect to this specific response. (Pl.'s Mot. Ex. 15.)

While the record reflects that Rogers was in pain in June 2018, a reasonable trier of fact could not find that a discrete incident of inadequate pain management in June 2018 caused a claim to accrue for which Rogers was required to file a tort claim notice before or immediately

PAGE 17 – OPINION AND ORDER

following December 7, 2018, when the administrative grievance process was due to be completed.

### D. Conclusion

Rogers has failed to meet his burden of showing that administrative remedies were effectively unavailable to him when he prematurely ended the grievance process by filing a tort claim notice in violation of OAR 291-109-0160. In other words, Rogers was not forced to choose between exhausting his administrative remedies and preserving any of his state law claims, because his tort claim notice deadline was not impending in early December 2018.

Although the Court is aware that the interplay between grievance process requirements and tort claim notice deadlines can be confusing, especially for non-lawyers, the exhaustion requirement is important because it allows prisons to attempt to resolve AICs' concerns without litigation when possible. Here, Rogers could have and should have waited to receive a response to his final appeal, which he was due to receive just six days later, before filing his tort claim notice. Based on the regulations in effect at the time he filed the notice, Rogers failed to exhaust his administrative remedies and therefore Defendants are entitled to summary judgment.[15]

### CONCLUSION

For the reasons stated, the Court GRANTS Defendants' Motion for Summary Judgment (ECF No. 48), and DENIES Rogers' Motion for Summary Judgment (ECF No. 22).

DATED this 5th day of March, 2021.

*Stacie F. Beckerman*

HON. STACIE F. BECKERMAN
United States Magistrate Judge

---

[15] In light of the Court's entry of summary judgment on the issue of exhaustion, the Court does not reach Defendants' alternative arguments.